By the Court.—Freedman, J.
This action is brought by the plaintiffs as owners of a leasehold estate for years in certain premises situated on the southwesterly corner of Sixth avenue and West Fifty-third street in the city of New York, and known as No. 100 West Fifty-third street, and Nos. 945 and 947 Sixth avenue in said city, for damages sustained by the construction and operation of an elevated railway in front of two sides of their premises. Their leases were for ten years from May 1, 1872.
The plaintiffs as partners used and occupied the premises for the purposes of their business as physicians, as a private residence, and as a home for the keeping, maintenance and treatment of their patients.
The elevated railway structure was built and is owned by the defendant, The Metropolitan Elevated Railway Company. In December, 1877, work was commenced in Sixth avenue opposite West Fifty-third street in making foundations, and the road along Sixth avenue was completed and the first train run on June 5, 1878. Some time about September, 1878, the construction through Fifty-third street was commenced, and the road finished and opened for travel in the latter part of January, 1879. On the Sixth avenue side the railway structure is about thirty feet from plaintiff’s premises, while the branch running off from the Sixth avenue line and running into and through West Fifty-third street comes within three or four feet of the walls of the house on the corner.
From the corner, and along West Fifty-third street, the railway structure gradually recedes from the house towards the center of the street, and at the rear end of the lot of the corner house the track is about seventeen feet from the wall of the house. The structure which supports the elevated railway, is arranged for a double track on Sixth *314 avenue, and a double track on West Fifty-third street. It rests on columns twenty-three or twenty-four feet high. The columns are about sixteen inches in diameter and about twenty feet apart, and there are three columns in front of plaintiff’s premises on West Fifty-third street.
By an order dated June 16, 1876, the name of the defendant, The Metropolitan Elevated Railway Company, was changed from “The Gilbert Elevated Railway Company ” to its present name. The statutes providing for and bearing upon the organization of the said company, its powers, duties, etc., are chapter 885 of the Laws of 1872 ; chapter 837 of the Laws of 1873 ; chapter 275 of the Laws of 1874; and chapter 606 of the Laws of 1875, the last named act being commonly called “ The Rapid Transit Act.”
The defendant, the Manhattan Railway Company, a corporation organized under the Rapid Transit Act, on or about May 20, 1879, leased the said elevated railways referred to, and since June 5, 1879, operated the same, with the exception of a short time, during which receivers were appointed for, and were in charge of, the Manhattan Railway Company.
Both companies were, therefore, duly organized under, and pursuant to, the laws of the state of New York, and authorized to take private property and acquire title thereto for the purposes of their organization, in the exercise of the right of eminent domain.
The plaintiffs complain, however, that no proceedings were ever taken to condemn their interest in the premises referred to, or of the owner thereof, or to compensate them or either of them for the injuries inflicted upon said premises by the construction and operation of the said railways. The concluding portions of the complaint of the plaintiffs are as follows, viz. :
“ IX. That by so building and operating the said railroad by defendants, the said property and the plaintiffs’ interests therein, and residence and business at that place are greatly depreciated in value, and they have suffered great injury and damage thereby, which is a continuing *315 injury, and said acts constitute both a trespass and a nuisance committed by defendants, as plaintiffs are advised and believe.
“That the noise so caused by operating said railroad, and the smoke and dust and dirt and stench and gas and vapor of steam arising therefrom, penetrate and enter said houses by day and night, on all the stories thereof, and constitute, with said other matters, a taking of the plaintiff’s property without compensation, for the use of the said railway com - panies ; as also the damage thereto by obstruction of views and of light and air, and by the noise of whistles and puffing of escaping steam and of crossing the frogs and switches, and the danger from sparks and cinders from the said engines, and the said gas and smoke and vapor of steam are exceedingly unhealthy and dangerous to the life and health of the occupants.
“ X. That the plaintiffs are advised and believe that defendants have no .lawful authority to so build and operate the said railroad, without compensating all abutting owners whose property is taken or depreciated in value by such operation, and no right to so build or operate it at all over the said sidewalks as alleged.
“Wherefore, they demand judgment for $25,000, as damages against defendants, the Metropolitan Elevated Railway Company, for all injury and damage caused by them to the plaintiffs by the building and operating of the Said railroad as alleged, and against the Manhattan Railway company for all injury and damage caused by them to the plaintiffs by their operating and maintaining and continuing the said railroad since June 5, 1879, as alleged, and for such other relief, order or judgment against either of the defendants as may be just, with costs.”
At the trial no question was made but that the Metropolitan Company had lawful authority to build, and that both the Metropolitan Company and the Manhattan Company had lawful authority to manage and operate the said elevated railways. But that authority is only the public consent, without which no railway can be built in or *316 through a street of the city of New York. Under the constitution, before any such railway can be built, there must be the authority of the legislature within the limits prescribed by the constitution, the consent of the local authorities, and the-consent of the owners of one-half in value of the property bounded on the street, or in lieu thereof, the determination of certain commissioners appointed by the supreme court, and all this is required whether there are any private rights or property in the street or not.
It was further agreed between the parties at the trial that Sixth avenue and West Fifty-third street,were opened and exist as public streets in the city of New York under and by virtue of proceedings duly taken under the act of of 1813. This involved the further concession that the fee to the soil of said avenue and said street was in the corporation of the city of New York, as provided by said act, in trust, however, for public use; that is to say, “in trust that the same be appropriated and left open for, or as a part of a public street, avenue, square or place forever, in like manner as the other public streets in the said city are, or of right ought to be.”
That in such a case an abutting owner, as such, though he owns no part of the street or avenue, has an easement in the street and avenue to the extent of light and air, and free access to, and egress from, his premises, and that any impairment of such easement by the construction and use of an elevated railway in a manner inconsistent with the ordinary uses of a street constitutes a taking of private property within the meaning of the constitution and entitles the owner to compensation, may be deemed to have been settled by the court of appeals in the case of Story v. New York Elevated Railroad Co. (90 N. Y. 122). The difference between that case and the case at the bar I shall notice hereafter.
That lessees or tenants of the abutting real estate have the same rights as owners whenever, and to the extent, they stand in the shoes of their respective owners, is a *317 logical as well as just deduction, and has not been seriously questioned by the defendants.
The most important questions presented by the appeal arise upon various rulings of the learned chief judge who presided at the trial, to the effect that the defendants were wrongdoers and continued trespassers because they had not exercised the right of eminent domain prior to the erection of the structure and the use of the road, and that therefore they did not stand upon the same footing, as to damages, on which they would have stood, if condemnation proceedings had preceded the work. Under this theory, testimony was admitted on plaintiff’s side, showing not only abatement of light, air, and access by the struc-. ture as erected, and abatement of light, air and access, and annoyance of inmates from smoke, noise, gas, &c., caused by the running of trains, but also loss of custom from patients, and expenditures of money in improving the leasehold property ; and on defendants’ side evidence was excluded by which it was sought to be shown that the rental value of the premises had not decreased, but increased, and the jury were instructed, among other things, that they might awaid damages for loss of business, to be estimated on the diminution of the net receipts, and that the amount expended by the plaintiffs in improving the premises and adapting them to their business might be considered by the jury as something giving character to the business and its capacity, and bearing upon the profitable use of the business.
The first question that presents itself, therefore, is whether the commencement of condemnation proceedings and the payment of the amount awarded in the course of the same, were conditions precedent to the erection of the structure and to the use of the railway. None of the elevated railway cases so far decided by the court of appeals determine this point.
In proceeding to the examination of this question it is to be conceded, as shown by Dykman, J., in Dusenbury v. Mutual Telegraph Company (11 Abb. N. C. 440), that *318 text-writers agree that, private companies ought to be required to pay before they appropriate. Mr. Cooley, in his Constitutional Limitations, page 702, says :
“ Where, however, the property is not taken by the State or by a municipality, but by a private corporation which, though for this purpose to be regarded as a public agent, appropriates it for the benefit and profit of its members, and which may or may not be sufficiently responsible to make secure and certain the payment in all cases, of the compensation which shall be assessed, it is certainly proper and it has sometimes been questioned whether it was not absolutely essential, that payment be actually made before the owner could be divested of his freehold.”
Chancellor Kent (2 Com. 339) has expressed the opinion that compensation and appropriation should be concurrent.
At the same time it is equally well recognized that this is not an inflexible rule, unless in terms established by the constitution. The constitution of the state of New York simply prescribes that, whenever it is proposed to take private property for any public use, the compensation to be made therefor, when such compensation is not made by the state, shall be ascertained by a jury, or by not less than three commissioners appointed by a court of record, as shall be prescribed. by law (Art. I. § 7). Under this provision the power of the state itself to appropriate the property of its citizens for public purposes and to defer payment for a reasonable time has been so frequently affirmed, that it is too late now to question it; and the principle has been extended to corporations created for purposes of local government.
Much, therefore, depends upon the statute in each particular case.
Under the acts applicable to the case at bar, the Gilbert (afterwards the Metropolitan) Elevated Railway Company had the power, for the purpose of constructing, maintaining and operating its road upon and along the routes designated by the commissioners, to enter upon and beneath *319 the streets and avenues included in the routes designated, and such use of the said streets and avenues, the statute says, shall be considered a public use consistent with the uses for which the streets and avenues are publicly held. If, in addition to these privileges, it became necessary for the company, in the proper execution of its powers and privileges, to acquire and hold real estate, or any interest therein, the statute of 1873, as well as the Rapid Transit act, conferred the power, in case of disagreement between the company and the owner, to acquire such real estate, or interest therein, in the manner and by the proceedings specially provided.
Upon this point the Rapid Transit Act (§ 18) provides for an application to the supreme court for the appointment of commissioners of appraisal on notice to the persons whose interests are to be affected by the proceedings. Section 19 regulates the proceedings on the presentation of the petition and the appointment of the commissioners. Section 20 prescribes the duties of the commissioners in ascertaining and appraising the compensation to be made, and in making their report, and section 21, how the report shall be confirmed and what order made and entered.
Section 22 then provides as follows : “ A certified copy of the order so to be made, as aforesaid, shall be recorded at full length in the clerk’s office of the county in which the land described in it is situated ; and thereupon, and on the payment or deposit by the company of the sums to be paid as compensation for the land, and for costs, expenses and counsel fees aforesaid, and as directed by said order, with interest from the date thereof, the company shall be entitled to enter upon, take possession of and use the said land for the purpose of its incorporation, during the continuance of its corpoi ate existence, by virtue of this or any other act; and all persons who have been made parties to the proceedings shall be divested and barred of all right, estate and interest in such real estate, during the corporate existence of the company as aforesaid,” &c.
Provision is also made by the statute for the determina *320 tioo of adverse and conflicting claims to the money to be paid as compensation for the protection of unknown owners and for appeal. But in regard to the latter it is specially provided (§22), that it shall not affect the possession by the company of the land appraised.
And by section 24 it is further provided as follows:
“ If at any time, after an attempt to acquire title by appraisal of damages or otherwise, it shall be found that the title thereby attempted to be acquired is defective, the company may proceed anew to acquire or perfect such title, in the same manner as if no appraisal had been made; and at any stage of such new proceedings the court may authorize the corporation, if in possession, to continue in possession, and if not in possession to take possession, and use such real estate during the pendency and until the final conclusion of such new proceedings; and may stay all actions or proceedings against the company on account thereof, on such company paying into court a sufficient sum, or giving security, as the court may direct, to pay the compensation therefor when finally ascertained,” etc.
The provisions above referred to are almost identical with the provisions of the general railroad act, as construed by the court of appeals in the matter of the N. Y. C. & H. R. R. R. Co. (60 N. Y. 116).
I am therefore of the opinion, that whether the right of the company to enter upon and take possession of the land depends upon the Rapid Transit Act or the general railroad act, if the statute of 1872 is to govern, the true intent and meaning of the statute, in either case, is that, as a general rule, appropriation and payment or deposit, shall be concurrent acts ; and as by the decision of the Story case the taking of an easement, in whole or in part, has been declared to be a taking of property, the rule, as stated, applies to the case at bar.
The next question, then, is, whether the omission by the company to institute the provisions provided by statute, increases, or in any wise changes, the liability of the com *321 pany to a person feeling aggrieved by the construction, maintenance or operation of the road?
Section 22 of the Rapid Transit Act provides that, if the company shall neglect to have the order confirming the report and directing the payment or deposit of the money recorded, and to make the payment or deposit of the money directed, for the period of ten days after the date of such order, any party to the proceedings, and interested therein, may, at Ms election, cause a certified copy of the said order to be recorded, and thereupon the moneys therein directed to be paid, with interest thereon from the date of said order, shall be a debt against the company, and the same shall be a lien on such real estate, and may be enforced and collected by an action at law or in equity in the supreme court with costs.
But thé same statute is, and all others that affect the organization, powers, duties and liabilities of the defendant corporations are, wholly silent as to the liability of the company in case of total failure to institute any proceedings whatever, and the most careful scrutiny fails to discover any provision which in such a case imposes a penalty or increased liability upon the company, or in any wise changes the measure of damages to which an individual would be entitled if proceedings were instituted.
This being so, the question relating to the liability of the defendants, and the extent thereof, must be determined upon general principles.
In searching for general principles that may be applicable, it will be found, on the one hand, that, in so far as the statute gives a summary remedy in the affirmative, without a negative express or implied, for a matter which is actionable at the common law, a party aggrieved may still sue at the common law as well as rely upon the statute, for the statute did not take away the common law remedy (Crittenden v. Wilson, 5 Cow. 165).
So, whenever in a given case, the common law gives an action, but no adequate remedy, and especially when it is necessary to prevent a multiplicity of suits a plaintiff may *322 apply for equitable relief by injunction, and an assessment of damages in connection therewith (Williams v. The N. Y. C. & H. R. R. R. Co., 16 N. Y. 97; Henderson v. N. Y. C. & H. R. R. R. Co., 78 Id. 423).
On the other band, the company, for failure to institute the special proceedings, may, under certain circumstances, be liable to successive actions as well as for interest. In the case of a continuous injury, as, for instance, the taking of apart of the land, or the taking, in whole or in part, of an easement attached to the land, in consequence of which the rental value of the whole has been affected, an action may be brought from year to year for the diminution of such rental value so long as grass grows and water runs (Green v. N. Y C. & H. R. R. R. Co., 65 How. Pr. 154).
But beyond these matters I know of no principle or rule of law, and I believe none exists, which, on account of the failure to institute proceedings for condemnation, by way of penalty or otherwise, enhances or increases the liability of the company for land or easements taken, beyond what it would have been if such proceedings had been had. I am therefore of the opinion that, except as above stated, the liability of every company, and the extent thereof, remain substantially the saihe whether proceedings of condemnation are or are not instituted.
What, then, are the general principles by which such liability of a railroad company, and the extent thereof, are measured and governed ?
The learned counsel for the respondents relies largely upon the case of the Fifth Baptist Church of Washington v. The Baltimore & Potomac Railroad Company, reported in the supplement to the Federal Reporter, Vol. II. p. 719. In that case it was held by the supreme court of the United States, that an engine-house and repair shop erected by a railroad corporation in a city so near to an edifice used by a religious corporation as a church, that the noise, smoke and odors, necessarily arising from the nature of the business carried on by the railroad company therein, rendered *323 the church uncomfortable and almost unendurable as a place of worship, and less valuable for the purposes to which it was devoted, is a nuisance, for which the railroad company is responsible in damages ; and that, as the congregation in the case have the same right to the comfortable enjoyment of its house, for church purposes that a private gentleman has to the comfortable enjoyment of his own house, it is the discomfort and annoyance in its use for those purposes which should be primarily considered in allowing damages, and not merely the depreciation in market value of the. property.
As to the measure of damages thus laid down, I am bound to say, with due respect, that it is opposed to the settled law of this state by which, in case of a conflict, I would have to be governed. For the court of appeals has expressly held, that between adjacent owners the rule is, that where one maintains a nuisance upon his lands which renders the premises of his neighbor disagreeable and uncomfortable, the proper measure of damages is the difference in the rental value, free from the effects of the nuisance, and subject to it (Francis v. Schoellkopf, 53 N. Y. 152; Jutte v. Hughs, 67 Id. 267; see also Briesen v. The Long Island Railroad Co., G. T., 2d Dept., not yet reported).
It can be readily demonstrated, however, that the decision of the Fifth Baptist Church case, as it is, does not apply to the case at bar. It is to the effect that, as between adjacent proprietors, the railroad company was guilty of maintaining upon Its land something which, as against the adjacent premises, constituted a nuisance in fact, and that therefore it was liable for all the damage caused. The principle underlying the decision isxthat every man is bound to so use his own property as not to injure his neighbor. This principle, as was shown by Miller, J., in Heeg v. Licht (80 N. Y. 579), rests in the consideration that, where the right to the undisturbed possession and enjoyment of property comes in conflict with the rights of others, it is better that a single individual should surrender the use of *324 bis land for especial purposes injurious to his neighbors or others, than that the latter should be deprived of the use of their property altogether, or be subject to great danger, loss and injury, which might result, if the rights of the former were without any restriction or restraint.
But the distinction is obvious between an engine-house, shop or other building used for business purposes which can be located anywhere, and a railroad route which is compelled to follow a prescribed line.
The fundamental principle underlying all railroad grants and franchises is that the railroad is for the benefit of the public, and that, in order to meet public necessities, the individual must-surrender his land on receiving compensation. It is therefore just the reverse, at least so far as the building of the road itself is concerned, of the principle enforced in the case of a private nuisance. If it were not for these public considerations, there would be no power anywhere in this country to compel a man to surrender his land against his will. But there being these public considerations, the railroad may take the land required, provided it makes compensation.
For the reasons slated, it was well settled in this state, before the decision of the case of Story which will be hereinafter referred to, that the legislature may rightfully authorize the construction of railroads or other works of a public nature, without requiring compensation to be made to persons whose property has not actually been taken or appropriated for use thereof, but who may, nevertheless, suffer indirect or consequential damages by the construction, or by the operation of such works (Radcliff’s Executors v. The Mayor of Brooklyn, 4 Comst. 195; Gould v. Hudson R. R. R. Co., 2 Seld. 522; Bellinger v. N. Y. C. R. R. Co., 23 N. Y. 42; People v. Kerr, 27 Id. 193; Corey v. Buffalo, &c. R. R. Co., 23 Barb. 482; Getty v. Hudson R. R. R. Co., 21 Id. 617 ; Ely v. City of Rochester, 26 ld. 133; Hentz v. L. I. R. R. Co., 13 Id. 646; Plant v. L. I. R. R. Co., 10 Id. 26; Chapman v. Albany & Schenectady R. R. *325 Co., 10 ld. 360; Drake v. Hudson R. R. R. Co., 7 Id. 508; Barnes v. South Side R. R. Co., 2 Abb. Pr. [N. S.] 415).
Butin the case of the actual taking of land for the use of a railroad company, the measure of damages was a fair and full compensation for what was taken. In such a case the owner was always held entitled to the value of the land taken, estimated in view of the purposes for which it was intended to be used, and, where the land taken constituted part of a larger parcel, he was also held entitled to damages for the consequential diminution in the value of the residue of his property, restricted within certain limits (Henderson v. N. Y. C. & H. R. R. R. Co., 78 N. Y. 422; Matter of N. Y. C. & H. R. R. R. Co., 6 Hun, 149).
For the reasons stated it was deemed equally well settled, in respect to streets, that, after the public authorities have taken, and provided compensation for the fee of the street, and appropriated the street to public use as a highway, the legislature may authorize the construction of a surface railroad over it without exacting compensation from the railroad company for the land,, or- the consequential injuries to abutting owners from such use of the highway (People v. Kerr, 27 N. Y. 188).
It was only in cases in which the plaintiff was the owner of the soil to the center of the street at least, subject to its use as a public street, that an action for damages or for injunctive relief was sustained (Williams v. N. Y. C. R. R. Co., 16 N. Y. 97; Craig v. Rochester City, &c. R. R. Co., 39 Id. 404).
And in Kellinger v. Forty-second street R. R. Co. (50 N. Y. 206), the decisions of the two bases last referred to were expressly held to have no application when the fee as well as the easement is vested in the public.
This doctrine as to the streets was reiterated by the court of appeals, in the decision of the case of the Washington Cemetery v. Prospect Park & C. I. R. R. Co. (68 N. Y. 591), and in the decisions of the elevated railway cases. Thus, in delivering the opinion in the Gilbert Elevated Railway case (70 N. Y. 361), Church, Ch. J., *326 says: “To determine what particular occupation of the streets is to be deemed a legitimate public use, involves important and delicate questions. They were very much debated in this court in the surface railroad cases, and the principles adjudicated in those cases will be regarded as obligatory upon the court in deciding future cases.”
In his opinion, in the case of Story, in favor of compensating abutting owners, delivered before a re-argument was ordered, Danforth, J., says: “The street railway cases, supra, are in no respect in conflict with this doctrine. The railroads in those cases were surface roads ; no part of the land was rendered impossible to passage with any vehicle or by any wayfarer; when constructed there was, as there had been, ‘away between two rows of houses,’ a street. The railway carriage was drawn along its surface on rails prepared for it, and differed in this respect alone from other means of transportation. There was nothing exclusive in the character of the railroad, nor was its use ‘inconsistent with any ordinary travel or passage over its tracks.’ This characteristic is pointed out by Emott, J., in People v. Kerr (supra), and the decision, as indicated by his opinion and that of Wright, J., seems to have been put on the ground that the maintenance of such a road did not impose a new burden upon any property, either of individuals, or of the city of New York. The act of the legislature, permitting its construction, did not enlarge the use of the street as a highway beyond the limitation of purpose of the trust, for execution of which the fee was vested in the city.”
And in the opinion finally pronounced in the case of Story, as the opinion of the court, after re-argument, Tract,. J., says: “The conclusion here reached (viz.: that compensation should be made) is not in conflict with the determination of this court in the case of People v. Kerr (27 N. Y. 188); Kellinger v. Forty-second Street R. R. Co. (50 N. Y. 206), and other similar cases.” ■
Since the decision of the case of Story, the same declaration has been repeated in Mahady v. The Bushwick R. R. *327 Co. (91 N. Y. 148), where Andrews, Ch. J., says: “. . . Bat that case (meaning the Story case), left untouched the decision in the People v. Kerr (27 N. Y. 188), that a horse railroad constructed under legislative authority on the surface of a city street, the fee of which was in the city, was not an unlawful interference with the rights of abutting owners, but was a street use consistent with their rights therein.”
And finally this distinction as to streets is even recognized in the opinion filed in the case of the Fifth Baptist Church, hereinbefore referred to, for in it Field, J., says : “Undoubtedly a railway over the public highways of the district, including the streets of the city of Washington, may be authorized by congress, and if, when used with reasonable care, it produces only that incidental inconvenience which unavoidably follows the additional occupation of the streets by its cars, with the noises and disturbances necessarily attending their use, no one can complain that he is incommoded. Whatever consequential annoyance may necessarily follow from the running of cars on the road with reasonable care, is damnum, absque injuria. The private inconvenience in such case must be suffered for the public accommodation. But the case at bar is not of that nature.”
Having now demonstrated at length, and, as I believe beyond the possibility of contradiction, what principles have always been recognized and are yet fully recognized, for considerations of a public nature, in the matter of the construction of railroads pursuant to legislative authority over and through public streets, the fee of which is in the public authorities, the time has arrived for considering what the final decision of the court of appeals in the case of Story v. N. Y. Elevated R. R. Co., (90 N. Y. 122), really amounts to.
Upon a careful examination of that case it will be found that the fundamental question involved, considered and determined, was, whether plaintiff’s property had been taken for public use within the meaning of the constitution *328 of this state, and the conclusions reached were that, even if the plaintiff did not own the fee to the center of the street, he had a right or privilege in the street, called an easement, which entitled him to have the same kept open and continued as a public street for the benefit of his abutting property, in the same manner in which public streets are, or of right ought to be, kept open ; that this right or privilege constituted an easement in the bed of the street; that such easement attached to bis abutting property and constituted private property within the meaning of the constitution of which he could not be deprived without compensation; and that the permanent structure of the elevated road, of the size and height and dimensions it was made to appear, occupied so much of the street and interfered so much with the ordinary uses of the street, and was so inconsistent with such uses, as to work a destruction pro tanto of the easement of the plaintiff to light and air, and ingress and egress, and that for these reasons he was entitled to compensation. The decision was placed upon the nature and character of the structure, and because the structure was found to be inconsistent with the ordinary uses for which the street was reserved, it was held to infringe upon the abutting owner’s easement in the bed of the street, and to this extent, but no further, was it held to amount to a taking of property within the constitutional provision. All the remarks that were made in the course of the reasoning concerning the unlawfulness of the acts of the defendants, were made in reference to these propositions, and it nowhere appears nor can it be inferred, that the court meant to go beyond these limits. When this is kept in view and considered in connection with the express declarations that the conclusions reached are not in conflict with the decisions of the surface road cases, it-is difficult to see how the decision of the Story case can be relied upon as authority for a liability beyond the value of the property taken, viz. : The value of so much of the easement as was taken in fact. Confined within these limits the decision of the Story case is indeed perfectly consistent with *329 the prior decisions of the surface railroad cases, and with all other authorities which are to the effect, that, in case private property which includes easements, is taken for public use, the measure of damages is the value of the property taken, and that, in the absence of negligence, consequential damages are inadmissible, except that where the property taken constitutes part of a larger parcel which is injuriously affected by the taking and the purpose of the taking, the injury to the larger parcel is also to be compensated for within certain limits.
The large number of cases cited by the counsel for the plaintiffs to the effect that a trespasser is liable for all the damages caused by his trespass, of which, Hay v. Cohoes Co. (2 N. Y. 159); Schile v. Brockhahus (80 Id. 614); Mairs v. Manhattan Real Estate Ass’n (89 Id. 498); and St. John v. Mayor, &c. (6 Duer, 315), are notable examples, may therefore be at once disposed of with the remark that they do not apply to their full- extent to the construction and operation pursuant to legislative authority of a railroad in and through a public street.
How, then, does the case of the plaintiffs stand in view of what has already been said %
It differs somewhat from the Story case, because in that case the easement of the plaintiff depended upon a covenant of the city, that Front street should be and remain an open street forever. In the case at bar there is no such covenant, but the plaintiffs have shown that the street and avenue on which their premises abut were opened under the act of 1813. The presumption, therefore is, that the abutting owners received compensation for the land taken for the purposes of the street and the avenue, and that at the same time they were assessed for the benefits which the opening of the street and the avenue was supposed to confer upon their property. Having paid for such benefits, they are entitled to enjoy them, and they have at least the same title to such enjoyment that they would have had if there had been a covenant made that the street and avenue should be and remain open forever. In acquiring *330 the fee of the street and avenue under the act of 1813, the city acquired it only in trust for the purposes of a street and avenue, and hence it may be said that the covenant is .writtenin the statute. But what are these benefits?
They constitute the easement hereinbefore spoken of, and the easement consists in the right or privilege of the abutting owner to use and enjoy the street and avenue as a public street or highway for the legitimate use and purposes of a street and highway. But he has no private or exclusive right to, or property in such use or enjoyment. All other citizens have an equal right with him. An abutting owner has therefore a right of access to and egress from his premises over the bed of the street, and a right to light, and air from the street. But at the same time it is the right of the public to pass and repass over the street with horses, carriages and other vehicles, and on foot, and for any annoyance or damage from any such cause the abutting owner has no remedy in the law.
A surface railroad, as part of the public, it has been held, has the same right of passage and repassage under the rules and regulations prescribed by proper athority; and the use of a street for the purposes of a surface railroad in a manner which does not materially abridge or obstruct the right of passage and repassage of the public in general, is not such an exclusive appropriation of the street as to constitute an inconsistent street use,* or to amount to a nuisance or purpresture. Such a railroad, having a lawful warrant for its existence and operation, cannot be a nuisance per se, although by negligent operation, or by an abuse of its privileges in the street it may become a private nuisance in respect to premises abutting on the street, and sustaining special damage. In these respects no distinction exists between steam and horse surface roads, except that in a densely populated city a steam railroad is more apt to degenerate into a private nuisance than a horse railroad. These questions bearing on the nature and extent of an abutting owner’s easement and on the liability of a railroad company for any infringement thereof, were *331 so fully discussed by me in case of Green v. N. Y. C. & H. R. R. R. Co., that time and space may well be saved here by a simple reference to a report of that case in 65 How. Pr. 154. I shall only add that subsequent reflection and research, aided by the arguments and briefs of the learned counsel for the respective parties in the present case, have not been able to raise a doubt in my mind as to the accuracy of the views, then and there expressed by me. The general conclusion reached in that case was :
“That the law of the public street of a city is motion ; that any use of a street, though a new one, which does not materially abridge or obstruct the right of passage and re-passage, of ingress and egress, and to light and air, of the abutting owner, gives no cause of action ; but that every unnecessary material abridgement or obstruction, though of a temporary character, and every continuous material abridgment or obstruction, though made in the pursuit of a lawful business, and to some extent called for by the circumstances arising in the course of such pursuit, by which the right of an abutting owner to pass and repass, to have free access to and egress from his own premises, and to enjoy the light and air from the street, is unreasonably affected (viz., beyond the limit dictated by the ordinary and proper uses of the street), gives to the injured party, in case of special damage therefrom, a right of action against the offending party for the recovery of the damages actually sustained ; and finally, that in order to determine any such question, each must be disposed of on its own facts and circumstances.”
And in respect to the measure of damages it was held, that the rule of damage was the impairment of the rental value of the premises from the time the plaintiff became the owner, to the time the action was commenced, and that the impairment should be determined with reference to the condition in which the premises were at the time that the plaintiff became the owner, and with reference to the uses for which they were then rented, or to which they could have been rented in the condition in which they were *332 in, but for the excessive exercise, if any there was, of defendants’ business.
Now the case at bar differs from the case of Green principally in this, that in it we have a structure of a permanent character erected upon posts or columns through certain streets and avenues of the city of New York, which necessarily constitutes an obstruction to the legitimate uses of the streets and avenues, and consequently to the extent to which it does so, an abutting owner under the act of 1813, is absolutely entitled to some compensation, provided he can show some special damage. But the difference is only in the proof. The principles applicable are the same, and the same rule applies to the sidewalks that applies to the road-bed of a street or avenue. The Gilbert, or Metropolitan Railway as it was afterwards called, was constructed and put into operation pursuant to the will of the people of the whole state to meet a public or supposed public necessity. In the statutes relating to the organization,' powers, duties, etc., etc., of the company, the use of the streets and avenues of the city of New York, which the company was authorized to make, was expressly declared to be a public use and consistent with the uses for which the streets and avenues of the city of New York are publicly held, and these statutes have been declared by the court of last resort to be constitutional (Matter of N. Y. Elevated R. R. Co., 70 N. Y. 327; S. C. 3 Abb. N. C. 401; Matter of Gilbert Elevated R. R. Co., 70 N. Y. 361; S. C., 3 Abb. N. C. 434).
The result is, that inasmuch as the doctrine of Craig v. Rochester City, &c. R. R. Co. (39 N. Y. 404), and of similar cases, was expressly held in Kellinger v. Forty-second Street R. R. Co. (50 N. Y. 206), to be inapplicable to a case in which the fee of the street is in the city of New York ; and as, furthermore, the decisions of the Kellinger case and of that of People v. Kerr (27 N. Y. 188), were held to have been left untouched by the decision of the Story case, I can, in the case at bar, arrive at no other conclusion than that, in the absence of negligence of which the plaintiff *333 made no-claim of any sort, the defendants at the trial had a right to demand:
1. That, in the determination of their liability and the extent thereof, the rules which have so long been so fully recognized in cases concerning the construction and operation of railroads under due legislative authority in and through such of the streets of the city of New York the fee of which is in the city, should be followed.
2. That, under these rules, they were liable, only for the value of the private property actually taken and the diminution in value of property directly affected by the taking of a part thereof.
3. That the abridgment, by the erection and maintenance of the elevated railway structure and by the operation of the road, of the easement which the plaintiffs, as lessees, had in the streets and avenues, constituted a taking of private property only to the extent that, within the rules laid down by me, the erection and maintenance of the structure and operation of the road were inconsistent with, and consequently in excess of, the ordinary uses for which said street and avenue had been set apart and reserved in law.
4. That only to the extent of such taking the defendants were liable to make compensation.
5. That the true measure of damages was the diminution, by such taking, of the rental value of the whole of the premises occupied by the plaintiffs ; and,
6. That, in any aspect of the case, damages for loss of business were too remote.
The conclusion thus reached and stated is in harmony not only with all the decisions of this state, hereinbefore referred to, but also with the law elsewhere.
In Ricket v. Directors, &c. of the Metropolitan Railway Co., 167 L. R. (2 House Lords App. Cases, 175), the plaintiff was the occupier of a public house with the sign of the “ Pickled Egg.” The deféndants, under certain statutes authorizing the building of the railway, blocked up the carriage way of, and erected boardings in, certain *334 streets from which a passage led to plaintiff’s house, but gave a passage to foot-passengers by steps and a temporary bridge across the street so obstructed to the passage which led to the plaintiff’s house. The boardings and steps were continued for twenty months, and access by wagon or carriage cut off during that period and then the streets and passages were restored to their original condition. The plaintiff, though not abutting owner, recovered for interruption and loss of business, and the case was finally carried to the House of Lords. The English statutes relied upon by the plaintiff required the company to make compensation to the owners or occupiers of, and all other parties interested in any lands taken, or used for the purposes of the railway, or injuriously affected by the construction thereof, &e., &c. They were occasionally much more liberal than the constitutional provision of the state of New York. Nevertheless it was held by the House of Lords: “that the obstruction of the highway complained of would not have been the subject of an action at common law, as an individual injury sustained by the plaintiff, because he suffered only in common with the rest of the public ; that under the statutes relied upon, the loss of business from persons who would have resorted to his house but for the obstruction of the highway was a consequential injury and too remote to be within the provisions of the statute ; and that no case comes within the purview of these statutes unless where'Same damage has been occasioned to the land itself, in respect of which, but for the statutes, the complaining party might have maintained an action.”
In Chamberlain v. West End of London and Crystal Palace Railway Co. (2 Best & Smith, Q. B. 605), the action was sustained because the evidence showed that certain houses, of which the plaintiff was lessee, had been injuriously affected in this, that access to the houses was rendered less convenient to the occupiers, and that many persons would be prevented from passing the same, whereby they were rendered less suitable for being used and occu *335 pied as shops, and the value of the houses had been greatly diminished.
In Cobb v. City of Boston (109 Mass. 438), which was a bill in equity to determine the just and reasonable damages that each proprietor, etc., was entitled to for his separate estate in certain lands taken by the city of Boston, under a certain statute, it was held, as follows : “ The Commissioners were right, in the case of Edwin M. Montague, in excluding the evidence offered as to the annual profits of his business as a grocer upon the premises. The only question was as to the value of his unexpired lease, and not as to the profits of his business, or the inconvenience of removing it to some other place. The good will of his business was no part of his lease, and under this statute could not be made a subject of inquiry, as constituting part of its value (Edwards v. Boston, 108 Mass. 535).”
In Western Pa. R. R. Co. v. Hill (6 P. F. Smith, 460), it is true, evidence was received that several farmers had ceased to send their grain to plaintiff’s custom mill on account of the danger and inconvenience of access to it, caused by the construction and operation of a railroad within thirty feet of it. But the evidence was received solely for the purpose of determining the diminution in value of the remaining land on which the mill stood, the railroad having been constructed through the land of the plaintiff.
And in Central Branch Union Pacific R. R. Co. v. Andrews (25 Alb. Law J. 357), it was held that where a railroad company obstructs an alley in a city, by building a railroad track through the alley, so as afterwards to make the alley useless as an alley, an abutting lot-owner has the right, if he chooses, to consider the obstruction as a permanent taking and appropriation of the alley by the railroad company, and may commence an action against the railroad company, and in such case the measure of his damages will be the injury to his lot at the time the alley was taken and appropriated by- the company, and not at the time of the trial of the case.
The correctness of the conclusion reached by me as *336 stated, becomes still more apparent when it is tested by the principle applicable to all cases, that the damages to be recovered must always be the natural and proximate consequence of the act complained of, whether they are general, viz. : such as necessarily result from the wrong alleged, or special, viz.: such as are never implied, but recoverable if specially pleaded (1 Green. Ev. § 256).
Sedgwick, in chapter 3 of his work on damages, in speaking of the rule prohibiting any allowance for damages remotely resulting from the principal illegal act, says:
“ Such damages are frequently termed remote damages, and sometimes consequential damages. These terms are not, however, necessarily synonymous, or to be indifferently used. All remote damages are consequential, but all consequential damages are by no means remote.
“We shall have frequent occasion to notice the existence of this principle hereafter, when examining more minutely the rules of damages in particular cases; but it is proper before entering on that part of the subject, to have an idea of the general boundaries of this branch of our jurisprudence.
“ It has already been- stated that the law does not aim at complete compensation for the injury sustained ; that it seeks rather to divide than to satisfy the loss ; and that in cases of contract as well as of tort, where no question arises of fraud, malice, or oppression, the direct pecuniary damage with the costs of the litigation form the measure of relief. In other words, the law refuses to take into consideration any damages remotely resulting from the act complained of. This proposition or one correlative to it, is expressed in the maxim causa próxima, non remota, spectatur ; or, in the language of Lord Bacon, ‘ It were infinite for the law to judge the causes of causes, and their impulsion one on another. Therefore, it contenteth itself with the immediate cause, and judgeth of acts by that without looking to any further degree.’ ”
Under the operation of lids general principle, which *337 pervades the civil as well as the common law, the measure of damages for an illegal entry upon real estate, or for interference with its enjoyment, whether the action was trespass, or trespass on the case, or proceedings as for a nuisance, always was the amount of injury directly resulting from the act complained of, viz. : the diminished value of the property or of the plaintiff’s interest in it, and not the cost of restoring the premises to their original condition.
The same principle prevails in the law of personal property. Thus, in trover, the value of the property at the time of the conversion, if it has not been restored and accepted by the plaintiff, with interest on that amount, is ordinarily the measure of damages. But if the plaintiff has himself recovered the property or it has been restored to him and accepted, he can only recover for the actual injury occasioned by the conversion, including the expenses of the recovery. In England this rule was sought to be extended. Thus, under a count in trover for the conversion of tools, by means whereof the plaintiff was prevented from working at his trade of a carpenter, they being the implements of his trade, it was held that the special damage directly flowing from the detention of his tools was recoverable. But in the United States, upon consideration of the rule, it has been held safer to adhere to the value at the time of the conversion, with interest (1 Green. Ev. § 276; Sedgwick Dam. ch. xix. ; Hurd v. Hubbell, 26 Conn. 389).
In applying the principle that the damages to be recovered must always be the natural and proximate consequence of the act complained of to the facts of the case at bar, it will be found that the damages naturally and proximately resulting to the plaintiffs as lessees, from the wrongful acts of the defendants, viz.: the taking and appropriating of plaintiff’s easement to an extent inconsistent with, and therefore in excess of, the ordinary street uses, consisted in the diminution of the rental value of the premises, in the condition they were in, during the *338 unexpired term of their lease. If, upon such taking, the plaintiffs had removed from the premises to other quarters suitable to their business, and then relet. the premises in question, their loss would have been the difference between what they received by jneans of the reletting, and the rental value the premises would have had for the unexpired term, in the condition they were in, but for the wrongful acts of the defendants. By remaining on the premises, loss to business may have ensued. But as that could have been avoided, it was not the natural and proximate, but the remote result of defendant’s acts. Thus it will be seen that even under the theory that the defendants were trespassers, loss of business is not a legitimate item of damage for what they have taken.
Caro v. Metropolitan Elevated Railway Co. (46 Super. Ct. 138), does not militate against these views. No question as to the measure of damages was involved in that case. The only question presented was whether the complaint, the allegations of which were admitted by the demurrer, upon its face showed a cause of action. It certainly did. But the case is further distinguishable from the present one by reason of the fact that the complaint charged that the wrongful acts complained of, or at least some of them, were not necessary to, or incident to, the operation of the road, and that the company was wholly insolvent.
Having reached the foregoing conclusion, it must be held, as a necessaiy corollary, that the rulings of the learned Chief Judge who presided at the trial, to the effect that for the failure of the defendants to institute proceedings of condemnation, ’they were trespassers for all purposes and as such liable for all consequential, as well as direct, damages ; that the plaintiffs could recover for loss of business to be estimated on the diminution of the net receipts ; that the amount expended by the plaintiffs in improving the premises and adapting them to their business, might be considered by the jury as something giving character to the business and its capacity, and bearing upon the profit *339 able use of the business ; and that the defendants were not entitled, to show that the rental value of plaintiffs’ premises had not been diminished by the construction or the operation of the road, were all erroneous.
The conclusions already announced call for a new trial, and hence I might stop right here. Inasmuch, however, as upon the new trial some additional questions will again arise which were involved in the present appeal, it is proper that the most important ones should be briefly noticed.
The refusal to allow the defendants to show that great care and skill were observed in the running of the road, was proper under the theory upon which the action was tried, because the plaintiffs did not claim negligence. If, however, upon the new trial, in the examination and determination of the question how far, within the rules laid down by me, the manner in which the road was operated, constituted an inconsistent street use, it should become material to show care and skill in the operation, the evidence would be admissible for that purpose and to that extent.
Evidence as to improvements made by the plaintiffs during the term of their lease, and as to their interest therein, is admissable in so far as it bears upon the condition of the premises, and their rental value in the condition they were, during the period of time for which compensation is sought. For the same reason and purpose, and to the same extent, evidence is admissible which shows the uses for which the premises were rented or to which they could have been put, in the condition they were in, during the same period, both with and without the actionable acts of the defendants. .But these limits must not be exceeded.
The instruction to the jury that the plaintiffs could not recover any damages subsequent to May 1, 1882, at which time they took a new lease, was clearly right. They were then under no obligation to pay further rent, and when, then and there, they voluntarily assumed a new obligation with knowledge of all the facts, the conclusion is inevitable *340 that they did not obligate themselves to pay any more than the fair rental value of the premises as determined by the existence and operation of the elevated railway. It is only where a second lease has been delivered and accepted before the expiration of the first, and before the taking of the property, that the estate in the premises is prolonged in such a way that the prolongation is to be considered in tlie computation of damages (Cobb v. City of Boston, 109 Mass. 438).
The action is against the Metropolitan Company for building the road and operating it down to the time the Manhattan Company took possession under the lease, and then against the Metropolitan Company as owner, and the Manhattan Company as lessee, jointly, for the maintenance and operation of the road subsequent to the making of the lease. Under the pleadings, as they stand, the. Manhattan Company cannot raise the objection that the complaint, though professing to set forth but one cause of action, really contains two distinct causes of action. If it does, the objection might have been taken by demurrer (Code, § 488) or answer (§ 498), and as it was not thus taken, it was waived (§ 499). Moreover the cases of the Chenango Bridge Co. v. Lewis (53 Barb. 112) and Irvine v. Wood (51 N. Y. 224), are authorities to the effect that both builder and user of an unlawful structure may be held jointly liable as owner and lessee. The most the Manhattan Company can ask is, that proper discrimination shall be made and that the damages shall be severed and separately assessed (1 Greenl. Ev. § 277 and cases cited).
There are other questions in the case and they have not escaped attention. They are not referred to, however, because, in view of what has already been said, théy have either become immaterial or can be readily disposed of hereafter.
The judgment and orders appealed from should be severally reversed and a new trial ordered with costs to the appellants to abide the event.
O’Gorman, J., concurred.